*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
HOLIFIELD, KISOR, and HARRELL
Appellate Military Judges

———————————————

**UNITED STATES**
*Appellee*

**v.**

**Jordan M. AMOS**
Master-at-Arms Third Class Petty Officer (E-4), U.S. Navy
*Appellant*

**No. 202400099**

———————————————

Decided: 24 June 2025

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Rachel E. Trest (arraignment)
Kimberly J. Kelly (motions and trial)

Sentence adjudged 6 December 2023 by a general court-martial convened at Naval Air Station, Jacksonville, Florida, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to E-1, confinement for twenty-four months, and a bad-conduct discharge.[1]

———————————————

[1] Appellant received 14 days of confinement credit.

For Appellant:
*Frank J. Spinner*
*Lieutenant Benjamin M. Cook, JAGC, USN*

For Appellee:
*Colonel Scott A. Wilson, USMC*
*Major Mary C. Finnen, USMC*

Chief Judge Emeritus HOLIFIELD delivered the opinion of the Court, in which Senior Judge KISOR and Judge HARRELL joined.

———————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

———————————————

HOLIFIELD, Chief Judge Emeritus:

Appellant was convicted, consistent with his pleas, of violating a lawful order, four specifications of obtaining services by false pretenses, two specifications of assault consummated by a battery, and two specifications of obstruction of justice, in violation of Articles 92, 121b, 128, and 131b of the Uniform Code of Military Justice (UCMJ).[2]

Appellant raises three assignments of error [AOE]: (1) whether the military judge erred in admitting rebuttal testimony about Appellant's military character; (2) whether the military judge erred in considering portions of a victim impact statement discussing crimes of which he was not the victim; and, (3) whether the plea agreement's term making the dismissal with prejudice of withdrawn charges contingent on Appellant's sentence being upheld on appellate review is unenforceable. We find no prejudicial error and affirm.

## I. BACKGROUND

On four separate occasions, Appellant created fake permanent change of station orders that he then used to terminate residential leases and avoid early

—————————

[2] Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 921b, 928, 931b.

termination fees.[3] All told, the value of the fees avoided was more than $12,000.[4]

Appellant also violated a lawful order by wrongfully travelling beyond the 350-mile limitation established in his command's Leave and Liberty Policy. During this unauthorized travel, he enjoyed visits to nightclubs despite being in a "sick in quarters" status.

Appellant was also initially charged with several much more serious crimes, including abusive sexual contact of Electronics Technician Third Class (ET3) Alpha, and abusive sexual contact, attempted sexual assault, and violent physical assault of a second Sailor, Aircrewman–Operator Airman (AWOAN) Bravo.[5]

The first victim, ET3 Alpha, alleged that, on or about 2 April 2022, in Panama City, Florida, he awoke to find Appellant touching ET3 Alpha's buttocks. He did not report it at the time.

The second victim, AWOAN Bravo, alleged he was sexually and physically assaulted on or about 6 April 2022.[6] On that date, AWOAN Bravo agreed to hang out with Appellant, a person he had only recently met. Along with ET3 Alpha, Appellant and AWOAN Bravo stopped to buy alcohol on the way to Appellant's apartment. Once there, they drank alcohol and played in and around the apartment complex's pool with a fourth Sailor, Boatswain's Mate Third Class (BM3) Charlie. While horseplaying in the pool, Appellant allegedly, without consent, reached into AWOAN Bravo's shorts and inserted his finger into the latter's anus.

Later, in Appellant's apartment, AWOAN Bravo felt a blow to his head that rendered him unconscious. He believes the blow was Appellant striking him in

---

[3] Section 3955 of the Servicemembers Civil Relief Act, 50 U.S.C. 3901 *et seq*, allows a servicemember, *inter alia*, to terminate a residential lease upon receipt of permanent change of station orders. Furthermore, the lessor may not impose an early termination fee in the event of such termination.

[4] Charge Sheet.

[5] All names in this opinion, other than those of Appellant, counsel, and judges, are pseudonyms.

[6] Pros. Ex. 1 and 30. What follows is based on AWOAN Bravo's description of events, admitted into evidence without Defense objection. Much of AWOAN Bravo's statements involve offenses to which Appellant pleaded not guilty and the convening authority has since withdrawn and dismissed without prejudice. They are provided here only to provide context to the question of whether the military judge erred in allowing ET3 Alpha's full victim impact statement at trial (AOE 2).

the head with a heavy, empty bottle he saw sitting nearby. When AWOAN Bravo awoke to the sound of someone knocking on the door, his shorts were around his knees and Appellant was positioned over him naked with Appellant's erect penis exposed. Appellant quickly put on his pants and answered the door, finding ET3 Alpha standing there. Petty Officer Bravo then grabbed his clothes and ran from the apartment with ET3 Alpha.

Appellant, a Master-at-Arms Third Class Petty Officer assigned to the installation's Security Department,[7] soon learned he was being investigated for various alleged criminal offenses, including those involving AWOAN Bravo. Appellant met with ET3 Alpha and asked that he: (1) delete any messages between Appellant and ET3 Alpha on his phone; (2) avoid saying that Appellant was drinking alcohol at the pool; and (3) delete from his phone a credit card app that might reveal that ET3 Alpha had purchased the alcohol. (Appellant was under the legal drinking age.)

Shortly thereafter, agents of the Naval Criminal Investigative Service (NCIS) interviewed ET3 Alpha regarding the events at Appellant's apartment complex and AWOAN Bravo's allegations. During a second interview the following day, ET3 Alpha told NCIS about Appellant assaulting him in Panama City.

Two weeks later, during a controlled telephone call recorded by NCIS agents, Appellant asked BM3 Charlie to tell NCIS she had not seen Appellant drink alcohol on 6 April. He also asked her to describe how AWOAN Bravo was acting "weird" at the pool, and to say that Appellant "seem[ed] like a nice guy" with a girlfriend. Finally, Appellant asked BM3 Charlie to file a sexual harassment report against AWOAN Bravo.

Pursuant to a plea agreement, the convening authority dismissed the charges alleging the attempted sexual assault, abusive sexual contact, and bludgeoning of AWOAN Bravo, as well as the abusive sexual contact of ET3 Alpha. In exchange, Appellant pleaded guilty to, *inter alia*, unlawfully touching ET3 Alpha's and AWOAN Bravo's buttocks in violation of Article 128, UCMJ. The plea agreement required a punitive discharge and a period of confinement between 6 and 24 months.

Additional facts necessary to address the AOEs are provided below.

---

[7] The Master-at-Arms rating is the Navy's primary law enforcement rating.

## II. DISCUSSION

### A. The military judge did not consider improper evidence in rebuttal.

Appellant claims that the military judge improperly allowed character evidence when he permitted Appellant's direct supervisor, Chief Master-at-Arms (MAC) Papa, to testify that (1) Appellant's work ethic is "terrible . . . one of the worst [he's] ever seen in 18 years of the Navy service" and (2) Appellant is "the most unreliable Sailor [he's] ever had."[8] We find no error.

#### 1. Standard of Review and the Law

We review a military judge's decision to admit evidence in sentencing for abuse of discretion.[9] "A military judge abuses his discretion when he admits evidence based on an erroneous view of the law."[10]

Our superior court has stated the purpose of rebuttal evidence is "to explain, repel, counteract or disprove the evidence introduced by the opposing party."[11] Furthermore, "the scope of rebuttal is defined by evidence introduced by the other party."[12] "[W]here a party opens the door, principles of fairness warrant an opportunity for the opposing party to respond, provided the response is fair and is predicated on a proper testimonial foundation."[13]

#### 2. Chief Papa's Comments Were Proper Rebuttal Evidence

During Appellant's sentencing case, his counsel offered a documentary exhibit that defense counsel described as "a series of character letters . . . a list of [Appellant's] awards . . . some of his Navy achievements . . . some of his Navy evaluations, and his training record."[14] In a letter with the subject "CHARACTER STATEMENT ICO MA3 JORDAN M. AMOS, USN," Appellant's former commanding officer stated that Appellant "performed all of his

---

[8] R. at 225.

[9] *United States v. Barker*, 77 M.J. 377, 383 (C.A.A.F. 2018) (citation omitted).

[10] *Id.* (citation omitted).

[11] *United States v. Saferite*, 59 M.J. 270, 274 (C.A.A.F. 2004) (citation omitted).

[12] *Id.* (citation omitted).

[13] *United States v. Eslinger,* 70 M.J. 193, 198 (C.A.A.F. 2011) (citing *United States v. Blau*, 17 C.M.R. 232, 244 (C.M.A. 1954) ("otherwise, an accused would occupy the unique position of being able to parade a series of favorable partisan witnesses before the court . . . without the slightest apprehension of contradiction or refutation") (internal quotation marks omitted)).

[14] R. at 193.

assigned tasks diligently," "was respectful and motivated to serve," and "was a good Sailor when [he] served with him."[15] In a second letter, with the same subject line, a fellow Sailor described Appellant as "one of the nicest people." The letter went on to discuss several examples of Appellant's friendship.[16] In a third letter—again, with the same subject line—another Sailor wrote: "[Appellant's] military bearing has always been on par and he treats superiors with respect."[17] Others described Appellant as "holding himself to high standards, delivering quality work [with] high morals,"[18] and being "caring and respectful."[19] Defense counsel offered several performance evaluations, covering Appellant's time at two previous commands. These reports describe Appellant as "motivated and meticulous,"[20] and someone who "demonstrates sound judgment, foresight, and professional competency."[21]

In rebuttal, the Government called MAC Papa, who proceeded to describe Appellant's poor work performance at his current duty station. Defense counsel objected to this testimony, claiming it was improper rebuttal evidence, although he later conceded that it would be proper for MAC Papa to discuss Appellant's work performance or "specific rebuttals of the [performance] evaluations that [the Defense] submitted."[22] Civilian defense counsel also assented when the military judge asked: "[D]o you agree that if you are asking me to consider [Appellant's] service, that the Government is entitled to present the Court with a full picture of his service?"[23] The military judge overruled the objection.

We find no abuse of discretion. Chief Papa's testimony squarely rebutted and fairly contextualized the evidence offered moments earlier by the Defense. The Defense set the scope of the relevant evidence, and the Government stayed within those lines.

Although Appellant makes much of the military judge indicating she would not allow MAC Papa to express any opinion about Appellant's character, this

---

[15] Def. Ex. A at 4.

[16] Def. Ex. A at 5.

[17] Def. Ex. A at 7.

[18] Def. Ex. A at 9.

[19] Def. Ex. A at 10.

[20] Def. Ex. A at 19.

[21] Def. Ex. A at 21.

[22] R. at 223.

[23] R. at 224.

is a point of no import. The nature of the evidence the Defense submitted openly invited rebuttal comment on Appellant's military character. Given this, the military judge's approach to MAC Papa's testimony was *overly conservative*; if there was error, the military judge's stated intent not to consider "any expression about character" in this context could only have benefitted Appellant.

## B. The military judge did not err in allowing ET3 Alpha's victim impact statement.

Appellant next claims the military judge erred in allowing ET3 Alpha, in his unsworn, written victim impact statement, to discuss how both the assault of AWOAN Bravo and Appellant's request to hinder the subsequent investigation affected him. We disagree.

### 1. Standard of Review and Law

"The meaning of Rule for Courts-Martial (R.C.M.) 1001 is a question of law that this Court reviews de novo."[24] "This Court reviews a military judge's ruling on an objection to a victim's unsworn statement for abuse of discretion."[25] "Abuse of discretion occurs when the military judge: (1) bases a ruling on findings of fact that are not supported by the evidence; (2) uses incorrect legal principles; (3) applies correct legal principles in a clearly unreasonable way; or (4) does not consider important facts."[26]

When applying R.C.M. 1001(c), "the military judge must make an individualized decision about each victim who seeks to exercise the right to be reasonably heard and the words through which he or she seeks to do so."[27] And "if the victim impact statement can be interpreted more broadly than the rules allow, the military judge must . . . state on the record . . . how the statement will be interpreted, in order to ensure both compliance with the rules and that the accused is only sentenced for the offenses of which he was found guilty."[28]

---

[24] *United States v. Campos*, __ M.J. __, 2025 CAAF LEXIS 141, at *8 (C.A.A.F. Feb. 19, 2025) (citation omitted).

[25] *Id.* (citation omitted).

[26] *Id.* (citations omitted).

[27] *In re AJW*, 80 M.J. 737, 744 (N-M Ct. Crim App. 2021), *writ-appeal denied*, 21 CAAF LEXIS 264 (C.A.A.F. Mar. 25, 2021) (citation omitted).

[28] *Id.* (citation omitted).

*2. The Victim Impact Statement Described the Direct Impact of Appellant's Offenses on ET3 Alpha*

At trial, defense counsel objected to various parts of ET3 Alpha's statement, including:

> Then the incident with [AWOAN Bravo] happened, and I was questioned by NCIS on the matter, which brought me back to the reality of things I was really trying to avoid. I didn't want to admit to myself that my friend could have done these things to me or anyone else, and I didn't want to admit that he had did [sic] to me and mostly didn't want anyone to know.[29]

Trial defense counsel's objection was that this statement was "not proper impact from ET3 [Alpha] for the misconduct [Appellant] committed upon ET3 [Alpha]. This is the impact on ET3 [Alpha] of the misconduct that Appellant committed on Airman [Bravo]."[30] Petty Officer Alpha's Victims' Legal Counsel responded, in part: "if you read [the] statement in its full context and in totality, it's . . . abundantly clear that . . . [Appellant's misconduct] had emotional impact on [ET3 Alpha]."[31]

The military judge initially appeared to be heading into shoal water by saying, "it would seem to me that ET3 [Alpha] is a victim under R.C.M. 1003(c)(2)(A) also of the offense against [AWOAN Bravo]."[32] But the military judge then placed a very specific limitation on this, saying she would only consider the victim impact statement's reference to the assault of AWOAN Bravo to the extent it "caused [ET3 Alpha] emotional pain because it caused [him] to remember also the offense against [him]."[33] That is, limited to the extent Appellant's assault of AWOAN Bravo forced ET3 Alpha to unwillingly confront the fact that Appellant—a friend—assaulted ET3 Alpha.

Given the military judge's narrow scope of consideration, we find no error. The judge found that ET3 Alpha suffered direct emotional harm when questioned regarding Appellant's assault of AWOAN Bravo in that it caused ET3 Alpha emotional pain in dealing with *his own assault*—an offense to which Appellant pleaded guilty. This finding was supported by the record and is all

---

[29] R. at 178-79.

[30] R. at 179.

[31] R. at 180.

[32] R. at 181.

[33] R. at 181.

that R.C.M. 1001(c)(2)(A) requires. Further, the statement itself, as limited in meaning by the military judge, met the strictures of R.C.M. 1001(c)(2)(B). Thus, the military judge did not abuse her discretion by considering ET3 Alpha's statement in this limited sense.

Appellant also claims the military judge improperly considered, over objection, any mention by ET3 Alpha of the obstruction of justice charge. Specifically, Appellant cites his trial defense counsel's argument that ET3 Alpha was not a victim of this offense, as "obstruction of justice doesn't have a personified victim, a named victim."[34]

In essence, Appellant asks this Court to read new language into R.C.M. 1001(c)(2)(A): that is, that the term "crime victim" includes only those victims specifically named on the charge sheet. We decline to do so. For the purpose of victim impact statements, the President has defined the relevant terms broadly. "[A] crime victim is any individual who has suffered direct physical, emotional, or pecuniary harm as the result of the commission of an offense of which the accused was found guilty."[35] And "victim impact includes any financial, social, psychological, or medical impact on the victim relating to or arising from the offense of which the accused has been found guilty."[36] There is no requirement that the offense have a named victim. It is enough that the offense in question directly caused such harm to "any individual."[37] We see no need to narrow the clear language of the Rule. And, based on our review of the record, we conclude the military judge did not abuse her discretion in finding that ET3 Alpha did, in fact, suffer emotional harm as a direct result of Appellant's efforts to obstruct justice.

Even if we assume the military judge abused her discretion, however, we find no prejudice. Appellant's sentence fell within the freely negotiated range contained in the plea agreement. In fact, his sentence was less than the plea agreement allowed. The military judge could have awarded a dishonorable discharge but did not.

---

[34] R. at 180.

[35] Rule for Courts-Martial (R.C.M.) 1001(c)(2)(A).

[36] R.C.M. 1001(c)(2)(B).

[37] Appellant's argument would presumably, and erroneously, also preclude a victim impact statement from an individual emotionally impacted by directly witnessing a crime with a named victim, e.g., a murder.

**C. Appellant's third AOE is not ripe for our consideration.**

Appellant claims the plea agreement's term making the dismissal of charges with prejudice contingent on the sentence being upheld on appeal, is unenforceable. Appellant asks this Court to either strike the words "and sentence" from paragraph 9 of the plea agreement or simply order the withdrawn charges dismissed with prejudice. We do neither.

This issue is not properly before us. It is not a ripe issue for review unless or until the Government re-prefers and re-refers the dismissed charges and specifications—something of which there is no evidence in the record. The matter would then come to us in the normal course of appellate review. But even if the question were properly before us, there is no basis for the relief Appellant seeks.

First, the matter is made moot by our affirming both the findings and sentence in this case. That is, the condition precedent for the Government withdrawing from the plea agreement under this provision has not occurred.

Second, this was a freely negotiated term of the plea agreement. During the plea colloquy, Appellant repeatedly assured the military judge he had read and understood the plea agreement. He specifically stated he had discussed paragraph 9 with his counsel, understood the provision, and had no questions regarding it.[38] Now Appellant seeks to void that part of the agreement yet still enjoy its remainder. But, if we agree with Appellant that the relevant term is contrary to public policy, we must also conclude that there was no meeting of the minds regarding the negotiated term. Accordingly, our remedy would be to set aside the guilty plea and sentence, returning the parties to *status quo ante—the same result the objected-to provision would accomplish.*[39]

Third, Appellant has provided no evidence of (or even argument regarding) any actual impact the term has had on the complete and effective exercise of his appellate rights. Instead, Appellant refers only to a nonspecific chilling effect. But this position is refuted by the very existence of his appeal before us. Seeing no evidence of such chilling, we see no need for a remedy.

---

[38] R. at 148.

[39] We fail to see how, as Appellant contends, such a provision would allow a convening authority to "restrict this Court's Article 66 power to take appropriate action on a sentence." Appellant's Br. at 40.

### III. Conclusion

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[40]

The findings and sentence are **AFFIRMED**.

FOR THE COURT:

MARK K. JAMISON
Clerk of Court

---

[40] Articles 59 & 66, UCMJ.